FILED

JUN 23 2017

Clerk, U.S Courts
District Of Montana
Missoula Division

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> vs. <br><br> STEPHEN MICHAEL BERRINGTON, <br><br> Defendant. | CR 17–03–BU–DLC <br><br><br> ORDER |

Defendant Stephen Michael Berrington ("Berrington") moves to suppress the evidence seized by law enforcement on January 17, 2017. (Doc. 16.) The Government opposes the motion. As discussed in greater detail below, the Court will deny the motion.

**FACTUAL BACKGROUND**[1]

On January 17, 2017, a task force of state and federal law enforcement officers gathered in Butte, Montana, to apprehend probationers who had absconded or otherwise had outstanding warrants for their arrest. Berrington, who had absconded from his probation, was one of the individuals sought by law

---

[1] This factual background is derived from law enforcement reports of the incident (Doc. 16-1) and from witness testimony at the hearing on the motion to suppress.

enforcement.[2] One of the officers, Montana State Probation and Parole Officer James Cameron ("Officer Cameron"), testified that previous attempts to locate Berrington at his listed residence in Butte had been unsuccessful. Instead, Officer Cameron and the task force attempted to locate him at another address, 11 North Henry Street, Butte, Montana. However, Berrington was not at the residence and an individual living there, Dawn Tracy ("Tracy"), told officers that she had not seen him for a couple days. Later that day, Tracy contacted Berrington on social media and told the task force that Berrington may be at his son's apartment, located at 1612 Silver Bow Homes, Butte, Montana.

Upon arriving at the address, the officers gathered briefly outside the apartment before knocking on the door. The apartment in question is two levels. The first level contains the apartment's entrance and a landing, which leads to a staircase to the apartment's living quarters on the second level. Berrington's son, Blake Berrington ("Blake"), answered the door on the first level and spoke with Detective Kevin Maloughney ("Detective Maloughney") of the Butte-Silver Bow Law Enforcement Department. There is considerable dispute as to what happened next.

---

[2] Officer Cameron testified that a "field warrant" had been issued for Berrington, which allowed the officers to place a "hold" on Berrington, i.e., take him into custody, until a bench warrant for his arrest could be issued by the state district court.

At the suppression hearing, Detective Maloughney testified that after knocking on the door, Blake answered and he took the lead in speaking with him. Detective Maloughney testified that he asked Blake if Berrington was in the apartment and Blake said yes. Detective Maloughney told Blake that he needed to speak with Berrington and asked if he and the other law enforcement officers could come in into the apartment. Detective Maloughney stated that Blake said yes and led the officers up the staircase to the second floor. At the time that he asked for consent to enter the apartment, Detective Maloughney testified that: (1) none of the officers had their guns drawn; (2) no force was used to enter the apartment; and (3) Blake was not put into custody or given any *Miranda* warnings.[3] Detective Maloughney's version of events is near identical to the testimony of three other law enforcement officers who witnessed his interaction with Blake: Officer Cameron, Montana State Probation and Parole Officer Jacob Miller ("Officer Miller"); and Deputy United States Marshal Matthew Brophy ("Deputy Marshal Brophy").[4]

---

[3] Officer Cameron also testified that none of the officers indicated to Berrington that they would get a search warrant if he refused to allow them to enter the apartment.

[4] At the suppression hearing, defense counsel noted that Deputy Marshal Brophy's testimony indicated that Detective Maloughney asked for Blake's consent to enter the apartment and consent was given, as opposed to asking Blake if the officers could come in to the apartment and talk with Berrington, as testified to by Detective Maloughney, Deputy Marshal Brophy, and Officer Miller. The Court finds this slight difference in Deputy Marshal Brophy's testimony to be inconsequential. The Court also notes that Deputy Marshal Brophy's testimony is consistent

Upon climbing the stairs to the apartment, Officer Cameron testified that the officers located Berrington sitting on the floor in an empty bedroom. Officer Cameron testified that he told Berrington that he had been looking for him due to his absconder status and ordered him to stand up. While compiling with the order to stand, Officer Cameron observed a "black woven style carrier" on Berrington's waist. Officer Cameron reported that based upon his training and experience, this type of carrier or holster is commonly used to carry weapons, such as a knife or firearm. Fearing for his safety, Officer Cameron closed the distance between the two men and restrained Berrington. With assistance from the other law enforcement officers, Officer Cameron searched Berrington and found a loaded .22 caliber semi-automatic handgun in the holster with a round in the chamber, as well as various paraphernalia associated with the use of methamphetamine. Based upon Berrington's possession of this firearm, and his status as a prohibited person, a criminal indictment was brought in this district charging him with one count of felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

Blake, who also testified at the hearing, disputes the officers' version of events. Blake testified that just prior to the officers "pounding" on his door, he heard their voices outside his apartment through a window. He states that the

---

with his report of the incident. (*See* Doc. 16-1 at 4.)

officers said the equivalent of, "we know you're up there," and if he didn't open they would get a key to his apartment. They then started "pounding" on his door and yelled, "Blake, we know you're in there. Open up." Blake then testified that when he opened the door, the officers entered the apartment without his permission, grabbed him by the arm, and dragged him upstairs. Blake states that after he was forcefully taken to the second floor, one of the officers sat him down by the window while the other officers entered the bedroom where Berrington was sitting. Based upon Blake's reported lack of consent to the officers entering the apartment, Berrington moves to suppress all evidence obtained following their entry as "fruit of the poisonous tree" in violation of the Fourth Amendment to the United States Constitution. *Wong Sun v. United States*, 371 U.S. 471, 488 (1963).

## ANALYSIS

The Fourth Amendment protects "against unreasonable searches and seizures." U.S. Const. amend. IV. The search of a person's home is presumptively unreasonable in the absence of a warrant. *Kentucky v. King*, 563 U.S. 452, 459 (2011) (citations omitted). Specifically, as is here, "[a]n arrest warrant does not carry with it the authority to enter the homes of third persons." *United States v. Harper*, 928 F.2d 894, 896 (9th Cir. 1991), *overruled on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012) (citing *Steagald*

*v. United States*, 451 U.S. 204 (1981)). Rather, "[b]efore law enforcement officers may conduct a warrantless probation search, . . . they must also have probable cause to believe that the probationer actually lives at the residence searched." *United States. v. Mayer*, 560 F.3d 948, 957 (9th Cir. 2009). However, a warrantless search is reasonable when a resident of a house or apartment voluntarily consents to a search. *United States v. Enslin*, 327 F.3d 788, 793 (9th Cir. 2003) ("Consent to search is a well-established exception to the Fourth Amendment's prohibition of warrantless searches of homes."). It is the Government's burden to show consent. *Enslin*, 327 F.3d at 793.

Berrington contends that the evidence obtained following the search must be suppressed because law enforcement lacked the authority to conduct a warrarantless search of Blake's apartment based on Berrington's probationary status. Specifically, Berrington argues that: (1) law enforcement lacked probable cause that the apartment was Berrington's residence; and (2) Blake did not consent to the officers entering and searching his apartment. The Court agrees with Berrington's first argument, but disagrees with the second.

First, from the testimony produced at the hearing it is clear that Berrington was not a resident of the apartment at 1612 Silver Bow Homes and, instead, was

merely an invited guest. This fact has not been disputed by the Government.[5]

Instead, the Court finds that Berrington's Fourth Amendment rights were not violated because the Government has satisfied its burden that Blake, the resident of the apartment, consented to the officers entering his residence to look for Berrington. The Court acknowledges that Blake steadfastly disputes the testimony of the four law enforcement officers who testified that he gave them permission to enter the apartment. However, based upon his demeanor and manner of testimony, the Court finds that Blake's version of events was not credible and places little weight on his testimony. The Court bases this conclusion on multiple grounds.

First, the Court found Blake's testimony to be confusing and erratic. For one, Blake testified that the officers discussed getting a key to let themselves into the apartment. However, this does not make logical sense because Blake immediately answered the door after the officers knocked and, therefore, no key was needed. Further, Blake testified that the officers could not have obtained a

---

[5] Rather, the Government contends that Berrington lacked any legitimate or reasonable expectation of privacy in the apartment and, thus, the search did not implicate his Fourth Amendment rights. *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) ("We have held that capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place.") (citations and internal quotation marks omitted). However, as discussed *infra*, because the Court finds that Blake consented to the search of his apartment, the Court need not take up this argument.

key at that time which adds to the Court's confusion. Second, his testimony adds critical and self-serving details that were lacking from a declaration filed by the defense's investigator. This declaration, derived from the investigator's discussion with Blake, makes no mention of the officer's reported menacing conversation outside his apartment or the reported force used by the officers as they ascended the apartment's staircase. (*See* Doc. 15.) The Court understands that minor details are often left out of declarations prepared by a third party. However, the fact that this declaration omits these striking details adds to the Court's scepticism of Blake's version of events.

In contrast, the Court found the testimony of Officer Cameron, Detective Maloughney, Deputy Marshal Brophy, and Officer Miller to be highly credible and consistent. Their individual testimony was on parallel with each other's testimony, and described a near exact chain of events which led to Berrington's arrest.[6] The officers' testimony also closely mirrored the various law enforcement reports which were filed following the incident. (*See* Doc. 16-1.) Finally, the Court found the officers' testimony to be credible due to their demeanor and manner. Consequently, the Court places great weight on their version of events

---

[6] The Court notes that just prior to the officers' direct testimony, defense counsel invoked the "witness exclusion rule," i.e., Federal Rule of Evidence 615. Thus, the law enforcement officers did not hear the sworn testimony of each other.

and finds that Blake consented to their entry into his apartment to look for Berrington. Because consent is an exception to the warrant requirement of the Fourth Amendment, the Court will deny Berrington's motion to suppress.

Accordingly, IT IS ORDERED that Defendant Berrington's Motion to Suppress (Doc. 16) is DENIED.

DATED this 23rd day of June, 2017.

*Dana L. Christensen*
Dana L. Christensen, Chief Judge
United States District Court